RANDOLPH (ROBINSON v.). See Cases Nos. 11,962 and 11,963.

## Case No. 11,562.

### RANDOLPH v. The UNITED STATES.

[Newb. 497.] [1]

District Court, E. D. Louisiana. Dec., 1854. [2]

COLLISION — FERRY BOATS — RIGHT OF WAY — WHAT LIBELANT MUST SHOW.

1. A ferry boat running in a certain track across a river, and compelled to make a certain number of trips within an hour, is not excused from taking ordinary precautions to avoid collision with a steamship.

[Cited in The John S. Darcy, 29 Fed. 648; The Greenpoint, 31 Fed. 231.]

2. Nor is a steamship, although the more powerful vessel, bound under such circumstances to steer clear of the ferry boat.

3. A ferry boat is undoubtedly entitled to her rights and privileges, but they are to be enjoyed with a due regard to the rights and duties of others, and like all others navigating the port of a commercial city, she is bound to be prepared for those occasions which call for the exercise of prudence, skill and caution.

[Cited in The Eddie Garrison, 65 Fed. 256.]

4. A party who comes into a court of admiralty to seek relief, in a case of this nature, should show, that all proper care, skill and prudence has been observed on board of his own vessel, to prevent the disaster of which he complains.

[This was a libel by William Randolph, owner of the Belleville, against the steamship United States, for damages resulting from a collision.]

Durant & Hornor, for libelant.
W. D. Hennen, for respondent.

McCALEB, District Judge. The libelant in this case claims damages for the loss of his ferry boat, called the Belleville, which was sunk in consequence of a collision with the steamship United States, between seven and eight o'clock in the evening of the 20th of August last. The ferry boat was making a trip across the river, from the ferry landing, in the Third district of this city, to Algiers, and the steamship was proceeding up the river to her landing, at the wharf opposite Jackson Square, at the time the collision occurred.

It is admitted on behalf of the libelant, that the ferry boat did not stop her engine or lessen her speed, and it is contended that having a right to a certain track across the river, and being compelled to make a certain number of trips within an hour, she was right in the course she pursued, and was not bound to take the ordinary precaution to get out of the way of the steamship; but on the contrary, that the latter, as the more powerful vessel, was bound, under the circumstances, to steer clear of her.

I am aware of no such exemption from responsibility, as that which has been claimed for this ferry boat. She was undoubtedly entitled to her rights and privileges; but they were to be enjoyed with a due regard to the rights and privileges of others. She had a right in the performance of her regular trips, to her usual path across the river to her landing in Algiers; but this right was not to be enjoyed at all times, and under all circumstances without regard to vessels coming up or down at the moment she might be making her crossing. Like all vessels navigating in the port of a large commercial city, she was bound to be prepared for those occasions which call for the exercise of prudence, skill and caution. To release her from such an obligation, would be virtually to expect all vessels, foreign and domestic, entering our port, to know the precise moment when a ferry boat is to leave one landing for another, as well as the very track she is to pursue.

In this case, the approach of the steamship was distinctly announced by the firing of her gun. Her position in the river was plainly visible to those in command of the ferry boat. The witness Matheny, who was the pilot on the latter, at the time of the collision, testifies, that "at the time when they rang the bell on the ferry boat to leave the wharf, the steamship United States was between the tobacco warehouse and the barracks. She was then coming up on this (the Orleans) side of the river, and when she got somewhere about the cotton press, she fired a gun." And again he says, "I saw the steamship when we left our landing on this side, and knew that she was coming up the river. I told the negro on the boat to hold on, to see whether we had time enough or not to get ahead of that boat that was coming up, and when we got out, I said to Mr. Randolph, 'I don't know whether he can get ahead or not.' At the time of this remark we were as far out as the United States was, she having just fired her gun."

The evidence of this witness shows, first, that he desired to hold on, to see if they could go ahead of the steamship: that he was doubtful whether or not they would be

---

able to do so, and that as a responsible officer in charge of the ferry boat, he thus speculated upon the chances of avoiding a collision when the delay of a minute would have been sufficient to remove all doubt or apprehension upon the subject: secondly, it shows that the witness was certainly mistaken in saying that the ferry boat was as far out into the stream as the steamship, when the latter fired her gun. If this were true it is impossible that a collision could have occurred, unless the ferry boat had remained perfectly stationary. It is satisfactorily shown that the steamship was ascending in the usual track of steamships proceeding to the landing opposite Jackson Square; that she was running at about one quarter, or one-third of the distance of the width of the river from the Orleans shore. It is also shown that there was ample time for the ferry boat to have gone far beyond her track, if it were true that the latter was as far out into the stream, as the testimony of the witness Matheny, would lead us to conclude. The steamship was running directly to her usual landing place, and when she deviated from her course, it is apparent from the evidence, that she did so, for the purpose of avoiding a collision when the ferry boat was discovered to leave suddenly the Orleans shore, and run directly across her bow.

On the part of the steamship, it has, moreover, been abundantly proven, that she was provided with all the requisite signal lights: that she had a good look-out on board: that her officers were at their posts, and promptly performed their several duties: that her usual speed had been lessened at some distance below: that when there was a prospect of a collision, her engines had been stopped and backed: and finally, her helm was put a-starboard for the purpose of turning her in the same direction the ferry boat was running, and thus breaking the force of the collision.

I am of opinion that the ferry boat was wanting in proper prudence and precaution in leaving the shore at the time she did; that she was to blame for running directly across the track of an ascending vessel, and for failing to stop her engines, and using the usual precautions for avoiding a collision. A party who comes into a court of admiralty to seek relief in a case of this nature, should show that all proper care, skill and prudence, had been observed by those in charge of his own vessel, to prevent the disaster of which he complains.- This, the present libellant has failed to do, and his libel must be dismissed with costs.

This decree was affirmed, on appeal to the circuit court, by Mr. Justice Campbell [case unreported].